(C.D. 2229)

W. C. Sullivan & Company *v.* United States

United States Customs Court, Second Division

(Decided January 11, 1961)

*Wallace & Schwartz* (*Barnes, Richardson & Colburn* by *Joseph Schwartz* and *Paul J. Gavin* of counsel) for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*Richard H. Welsh* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before Lawrence, Rao, and Ford, Judges

Lawrence, Judge: An importation of three Berthelsen presses and parts thereof from Denmark was classified by the collector of customs as articles having as an essential feature an electrical element or device, and parts thereof, within the purview of paragraph 353 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 353), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, and assessed with duty at the rate of 13¾ per centum ad valorem.

It is the claim of plaintiff herein that the importations should properly have been classified as machines, finished or unfinished, not specially provided for, and parts thereof, pursuant to paragraph 372

of said act (19 U.S.C. § 1001, par. 372), as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, for which duty at the rate of 13 per centum ad valorem is provided.

For ready reference, the competing provisions of the statutes are here set forth—

Paragraph 353, as modified, *supra*:

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

| | |
|---|---|
| Batteries | * * * |
| * * * * * | * * |
| Other * * * | 13¾% ad val. |
| Parts, finished or unfinished, wholly or in chief value of metal, not specially provided for, of articles provided for in any item 353 of this Part (not including X-ray trubes or parts thereof). | The same rate of duty as the articles of which they are parts. |

Paragraph 372, as modified, *supra*:

Machines, finished or unfinished, not specially provided for:

| | |
|---|---|
| Adding machines | * * * |
| * * * * * · | * * |
| Other * * * | 13% ad val. |
| Parts, not specially provided for, wholly or in chief value of metal or porcelain, of any article provided for in any item 372 in this Part. | The rate for the article of which they are parts. |

In addition to the testimony of three witnesses offered on behalf of plaintiff, there were received in evidence the following exhibits—

Plaintiff's illustrative exhibit 1—a photograph stated to be a substantial representation of the machines in issue.

Plaintiff's illustrative exhibit 2—a copy of a United States Patent Office letters patent number 2,627,289, which describes, generally, the construction and operation of a Berthelsen hydraulic press.

Plaintiff's exhibit 4 is limited to the illustration appearing on a page from the October 1947 issue of a periodical entitled "Wood Products."

Defendant's exhibit A—an advertising pamphlet of V. Berthelsen Engineering Works, Inc., of Joliet, Ill., with particular reference to paragraphs 3 and 5 appearing on page 2 thereof.

The first of plaintiff's three witnesses was Kaj I. Winther, president and founder of the Berthelsen Engineering Works, Inc., which company imports hydraulic presses, manufactures such presses, and also sells them. He stated that he had been with the Berthelsen company since 1948 and had been in the hydraulic press field since 1925. The nature of his work has been in all phases of the business, including

operating, engineering, selling, financing, and importing. He described a hydraulic press, generally, as a press consisting of three or four platens which are pressed together by means of a fluid which is being pushed into cylinders through a pump. He explained that the word "platen" refers to the plate that is used in a hydraulic press and that the word "hydraulic" means that the press is being operated by a liquid which is pumped into a vessel.

Winther testified that he had seen the three machines in issue in operation at his company's plant where they were tested prior to delivery and that he had seen similar machines in operation in various customers' plants. He stated that hydraulic presses are used for laminating wood, paper, metal, plastic, or almost any kind of raw or manufactured material known to the engineering industry. The presses are used for the purpose of producing pressure while the platens are being heated in order to set or cure the particular adhesive that is being used. Using plywood as an example, the witness explained that after a veneer has been rolled off a log, three pieces or even up to seven pieces of veneer, varying from a 32d of an inch up to one-eighth of an inch, are placed together and, by the application of pressure of from 140 to 250 pounds per square inch while the platens are under heat, the veneer is laminated into what is known as plywood board in the building industry. The pressure is obtained by forcing liquid into cylinders by a pump. The motivating power to drive the pump may be anything from hand-power to what is most commonly used today, a belt drive. With specific reference to the pumps used in the Berthelsen hydraulic presses, the witness stated that they are belt operated and that the motivating power can be electricity, gasoline, diesel, or any other power source. He testified that there is nothing in the hydraulic presses before the court which is an electrical feature or an electrical element.

As to the operation of the Berthelsen hydraulic presses, Winther stated that usually an electric motor is utilized because it is a modern means of power. The electrical motor furnishes the power to the pump through a belt. The pump, in turn, pumps the oil into cylinders and the cylinders will then force the pistons up causing the platens or tables to move together and furnish the necessary pressure. After remaining in a compressed state for a certain length of time, an operator can throw a handle that opens up a dump valve, causing the machine to open. This latter operation can be done electrically if the customer so desires. While the platens are pressing together the pieces of material to be laminated, the platens must be heated. The heat is usually supplied to these platens by steam pipes from an existing boiler in the customer's plant. The boiler can be fired by coal, oil, or electricity.

Winther's attention was directed to defendant's exhibit A on page 1 of which part of the press therein depicted was encircled in red ink and marked "Kontrol panel." He testified that, whereas a control panel is used for the operation of the Berthelsen hydraulic presses, it is not essential. When asked to explain what the control panel contains and its method of operation, the witness stated that it consists of a pump and a series of valves, a manometer to give the pressure, an emergency check valve, in the event it should be necessary to lower the press immediately before reaching its full pressure, and a clock to show the time. The source of power which operates the control panel is hydraulic not electric. The control panel would work if it were not electrically wired. In such a case, a man would stand at the press, watch the clock, and pull a handle when the press should be released. Two of the instant hydraulic presses were imported with control panels. When asked whether, in those cases where a hydraulic press is fitted with electrical wires in a control panel, such wiring is essential to the use of the machine, the witness replied "definitely not," explaining that the press can be operated by hand and that it was only about 6 years ago that they started to have such presses operated electrically at the request of their customers.

The testimony of plaintiff's other two witnesses is corroborative of the testimony of witness Winther. Edward F. Steck, executive vice president of Berthelsen Engineering Works, Inc., a graduate mechanical engineer who has been in the machinery business since 1946, also stated that although the three machines before the court contain electrical wiring, the functioning components of the presses are operated hydraulically, getting their power primarily from an external source, with the result that the devices are not electrical articles. Power to the machine is delivered by a belt to a pulley shaft of the hydraulic pumps. Although it is intended to utilize an electric motor to supply that motor power to the instant machines, some other type of power, such as gasoline or diesel engines, could be applied through the use of a driveshaft to deliver the equivalent power. Since electricity was to be the motivating power to the pump of at least two of the instant presses, control circuit wiring was included with the machines to operate a start and stop button and electric timer. Whereas to change the instant machines for use by some power other than electricity a modification of the apparatus would be necessary, witness Steck stated that the nature of the modification would be minor. The presses in issue, consisting of press frames, cylinders and pistons, platens, pumping unit, pressure controls, timer, and heating system, did not have to be electrically operated for the instant machines to function, and the presses could be operated in a place where there was no electrical power or if there were a failure of electrical power.

Plaintiff, by its protest, controverts the classification by the collector of customs of the instant Berthelsen presses as articles having as an essential feature an electrical element or device within the provisions of paragraph 353 of the Tariff Act of 1930, as modified, *supra.*

From the description of the machines contained in the testimonial record, it is to be deduced that the essential electrical feature may either be the motivating power which operates the presses, or the control panel which is one of the features thereof.

The question as to what constitutes an "essential" electrical feature within the meaning of the statutory provision in issue has been the subject of judicial construction in several cases. In *United States* v. *Dryden Rubber Co.*, 22 C.C.P.A. (Customs) 51, T.D. 47050, it was stated that "The electrical feature must be an essential feature, without which the article will not function, normally, for the purposes intended." If an article has been designed to be operated by electrical power and could not normally otherwise function, it is, of course, an article with an essential electrical feature within the scope of paragraph 353 of the tariff act. However, if the substitution of a nonelectrical feature for the electrical one can be made without modification in whole or in part of the article designed to be used therewith, and after the substitution has been effected the article will function normally for the purposes for which it was intended, the electrical feature is nonessential and paragraph 353 would not apply. *Ralph C. Coxhead Corp.* v. *United States*, 22 C.C.P.A. (Customs) 96, T.D. 47080.

In the instant case, the record discloses that electric motors did not accompany the presses in issue, and no provision was made in the design and construction of said mechanisms to have electric motors added thereto as integral and constituent parts thereof. Although electricity could be the power provided to motivate the pump by means of a belt drive, the record is clear that other sources of power derived from a gasoline engine or diesel engine, for example, could reasonably be substituted.

In the recent case of *United States* v. *Baker Perkins, Inc., R. F. Downing Co., Inc.*, 46 C.C.P.A. (Customs) 128, C.A.D. 714, wherein the proper classification of a cocoa liquor grinding mill was in issue before the court, our appellate court, in reversing the decision of the court below (*Baker Perkins, Inc.*, and *R. F. Downing & Co., Inc.* v. *United States*, 40 Cust. Ct. 78, C.D. 1961) stated—

* * * We cannot agree with the conclusion below that the electric motor by which appellees' mill is driven makes it essentially an electrical article. It was a grinding mill having a drive shaft to which a pulley was attached. Any source of adequate power connected to that pulley to rotate the shaft would run the machine. Except for practical and commercial considerations, in the operation of a chocolate factory in a given location, the power source would be immaterial. Selection of an electric motor did not make the grinding mill an es-

sentially electrical article. The following from the *Dryden* [*supra*] case is pertinent:

> From what has been said, it follows that if the article, when it is imported, is designed and constructed to use electrical power, or other power, interchangeably, then it has not, as an essential feature, an electrical element or device.

It is, therefore, obvious that the Berthelsen presses in issue are not articles having as an essential feature an electrical element or device, by virtue of the fact that the motivating power thereof need not be electricity but may be provided by other sources. *John A. Steer & Co.* v. *United States*, 24 C.C.P.A. (Customs) 293, T.D. 48737.

Consideration must now be given to whether or not the control panel, which formed part of at least two of the instant importations, would bring the presses within the provisions in paragraph 353. As indicated by the testimonial record, the control panel provides a start and stop button and timer by which the compression of the platens in their function of laminating materials is gauged.

On this phase of the case, defendant's counsel has invited the attention of the court to paragraph 5 on page 2 of defendant's exhibit A where, under the title of "automatic control panel," there appears the following—

The controls are centrally located on a convenient control panel. At the end of each curing cycle, which is pre-set on the timer gauge, the timer automatically releases the hydraulic pressure which opens the press. The operation is repeated by the operator pushing the start button. A stop button is provided to stop the pump in an emergency. By actuating a special lever on the hydraulic system it opens immediately.

However, a perusal of letters patent number 2,627,289, in evidence as plaintiff's illustrative exhibit 2, which deals with the constructional characteristics of the basic Berthelsen hydraulic press (of which the devices in issue were stated by witness Winther to be "streamlined" exemplars), gives no indication that an electric control panel is an essential feature thereof.

In view of the fact that the actual functioning of a Berthelsen press is predicated on the principle of hydraulics; that when electricity provides power to motivate the pump it is an alternative rather than an essential power source; and that the features of the control panel are related to the starting and stopping of such an electric motivating force which the record discloses may also be performed manually, it is the opinion of the court that said control panel does not constitute an essential electrical feature within the meaning of the *Dryden* and *Coxhead* cases, *supra*. Note also *Norman G. Jensen* and *Waverly Sugar Company* v. *United States*, 25 Cust. Ct. 27, C.D. 1258.

The court, therefore, holds that the Berthelsen hydraulic presses in issue are not articles having as an essential feature an electrical element or device within the purview of paragraph 353 of the tariff act, a modified, *supra*, as classified by the collector of customs.

From the testimonial record and the various exhibits in evidence, there is no question but that said hydraulic presses are machines within the purview of paragraph 372 of said act, as modified, *supra*. *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T.D. 37537, *United States* v. *J. E. Bernard & Co., Inc.*, 30 C.C.P.A. (Customs) 213, C.A.D. 235, and *United States* v. *Baker Perkins, Inc., R. F. Downing Co., Inc., supra.*

For the foregoing reasons, we hold that the Berthelsen presses and parts thereof should properly have been classified as machines, finished or unfinished, not specially provided for, and parts thereof, in paragraph 372 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, *supra*, and subjected to duty at the rate of 13 per centum ad valorem, as claimed by plaintiff.

Judgment will issue accordingly.