(C.D. 2336)

KEER, MAURER COMPANY v. UNITED STATES

United States Customs Court, Second Division

(Decided May 1, 1962)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Paul J. Gavin* of counsel) for the plaintiff.

*William H. Orrick, Jr.*, Assistant Attorney General (*Murray Sklaroff, Richard H. Welsh,* and *Richard E. FitzGibbon*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges ·

LAWRENCE, Judge: A machine manufactured in Germany and described on the invoice as "1 (one) 'HELIOS' Rotary Window Punching and Patching Machine Model 31 J" was classified by the collector of customs as an article having as an essential feature an electrical element or device in paragraph 353 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 353), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, and duty was imposed thereon at the rate of 13¾ per centum ad valorem.

Plaintiff contends that the importation does not have as an essential feature an electrical element or device, within the meaning of said paragraph 353, and should be classified as a machine in paragraph 372

of said act (19 U.S.C. § 1001, par. 372), as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and dutiable at the rate of 12 per centum ad valorem.

The pertinent text of the statutes involved is here set forth.

Paragraph 353 of the Tariff Act of 1930, as modified by the Torquay protocol, *supra*:

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:
    Batteries * * *

*　　　*　　　*　　　*　　　*　　　*　　　*

    Other * * *_____ 13¾% ad val.

Paragraph 372 of said act, as modified by the Sixth protocol, *supra*:

Machines, finished or unfinished, not specially provided for:
    Adding machines * * *

*　　　*　　　*　　　*　　　*　　　*　　　*

    Other * * *_____ 12% ad val.

The case was submitted for decision upon the testimony of one witness called by plaintiff, together with the following four exhibits:

Plaintiff's exhibit 1—illustration of the machine in question.

Plaintiff's illustrative exhibit 2—schematic diagram, showing the principal operating features of the machine.

Plaintiff's illustrative exhibit 3—preshaped piece of paper representing an envelope blank, except for the cutout portion, which is fed into the machine.

Plaintiff's illustrative exhibit 4—typical envelope blank that has passed through the imported machine, bypassing only the printing operation.

Plaintiff's witness, Sanford Kossar, testified that he was vice president of the Berkley Machine Co. of Kansas City, the actual importer of the merchandise in controversy, and is familiar with all phases of the business of the company, which is engaged in the importation of envelope machinery from Germany to be used in envelope printing, cutting, folding, and gumming. Kossar holds an engineering degree from Cornell University and is familiar with the structure and method of operation of the subject machine.

Kossar described the device as a window punching and patching machine, which is used in manufacturing a well-known type of window envelope. In operation, the machine takes a stack of envelope blanks and automatically withdraws each blank, passing it by an aniline ink printer, which prints on one side of the sheet of paper. The blank form continues its course through the machine and, in the next opera-

tion, two sets of knives cut the window opening in the blank, which is followed by an application of an adhesive around the window opening. Continuing its travel through the machine, a transparent material, such as glassine or cellophane, is applied over the window opening and held to the paper by the adhesive. This completes the operation.

Exhibit 4 illustrates a typical envelope blank after it has completed the operation above described, except that it has not been printed.

The witness also explained that the machine is so constructed that it can be used either as a printing press, a window punching machine, a patching machine, or in a combination of two or three of those functions.

Upon importation, the main drive motor did not accompany the machine; it was supplied in this country. However, the following electrical equipment did accompany the machine at the time of entry. As stated by the witness:

* * * it had an analine [sic] pump motor on it, and it had the control panel we referred to in the schematic diagram, with the various components inside. It also had a connection box for plugging the analine [sic] ink motor into the machine. This box would correspond very much with a wall socket, and the plug at the end of a wire found on a lamp. It had a device we call a dripolator. This is a simple type of dripping device called an oiling device, which would feed drops of oil or liquid and in which there is a small coil.

Also, there was a solenoid, which is, I guess, in common terminology known as electromagnet. I believe that is all that I can tell you.

All of said electrical equipment, except the solenoid, was supplied by the Berkley Machine Co., which shipped it to the German manufacturer to be incorporated into the machine in controversy, it having been understood that it would be, and it presently is, operated by electrical power. Inasmuch as the electrical parts above referred to, with the exception noted, were of American origin, they were granted freedom from duty upon entry.

When it is desired to operate the machine electrically, two electric motors are added; a main drive motor located on the factory floor is connected to the machine by means of flexible V rubber belts, indicated between the letters A and B on illustrative exhibit 2, and a vacuum pump motor adjacent to the machine, bolted to its conventional base and attached to the vacuum pump by a coupling of parts, is then connected to the operating parts of the machine by means of four vacuum pipelines.

Based upon his engineering training and experience with the subject machine, Kossar testified that modifications of the machine could easily be performed by a mechanic or maintenance man so that it could be powered by a gasoline, steam, or diesel engine and successfully perform its normal function of processing 13,000 envelope blanks

per hour. Kossar stated that the modifications which would enable one to operate the imported machine by other than electrical power would not require more than 3 or 4 hours of labor. The witness then described in detail, not necessary to repeat here, how easily this could be done at an expense of some $15.

It may be noted, however, that the witness stated he had never seen the machine used with other than electrical power, nor had he ever known of its being used differently.

There has been much litigation during the past 30 years involving the interpretation and application of the phrase "articles having as an essential feature an electrical element or device," which appears in paragraph 353, *supra*. A case which has been frequently cited and quoted on this subject is *United States* v. *Dryden Rubber Co.*, 22 C.C.P.A. (Customs) 51, T.D. 47050. The court was there concerned with the classification of a machine which was designed for use in cutting or slicing sponge rubber cake. The machine was accompanied by two electric motors, one of which supplied the motive power for the machine. The other motor motivated two small emery wheels, which were used to sharpen the cutting blade.

The crux of the decision in determining whether a machine is within the language above quoted, is expressed in the following statement of the court:

\* \* \* The electrical feature must be an essential feature, without which the article will not function, normally, for the purposes intended, \* \* \*.

In other words, if an article has been designed to be operated by electrical power, and cannot normally function otherwise, it is an article with an essential electrical feature, within the scope of paragraph 353. If, however, the substitution of nonelectric features for the electrical ones can be made without substantial modification or reconstruction of the functional properties of the machine, it is not an article having as an essential feature an electrical element or device, within the meaning of said paragraph 353. Note also, *Ralph C. Coxhead Corp.* v. *United States*, 22 C.C.P.A. (Customs) 96, T.D. 47080. In that case, the court, in considering the meaning of the term "having as an essential feature" in paragraph 353, made the following observation—

\* \* \* We think Congress, by that term, meant that the motor or the electrical feature of the article must be essential to the operation of the article and that if the article was so designed and constructed that it could normally operate in two ways, both by electrical power and by hand power, interchangeably, it would not be an electrical article and the electrical element or device would not be an *essential element or device.* \* \* \* [Italics quoted.]

In a case recently decided by us, *W. C. Sullivan & Company* v. *United States*, 46 Cust. Ct. 31, C.D. 2229, a similar situation was presented.

The merchandise there under consideration consisted of so-called Berthelsen hydraulic presses, for use in laminating wood, paper, metal, plastic, and certain other materials. While it appeared that, in the operation of the presses, an electric motor was generally utilized, because it was a modern means of power, and that the machines were also equipped with electrical control panels, nevertheless, since the evidence disclosed that the machines could just as easily be operated by other than electrical means and that the features of the control panel could be performed manually, we held that the presses were not articles having as an essential feature an electrical element or device, within the meaning of paragraph 353, *supra*.

In reaching our conclusion, we considered the *Dryden* and *Coxhead* cases, *supra*, but were largely influenced by the decision of our appellate court in a more recent case, *United States* v. *Baker Perkins, Inc., R. F. Downing Co., Inc.*, 46 C.C.P.A. (Customs) 128, C.A.D. 714. That case related to the classification of a cocoa liquor grinding mill which was not only equipped with an electro-magnet used for the purpose of extracting foreign metal particles from the material to be ground, but it was also the intention of the importer to employ an electric motor to power the machine, that being regarded as the most practical and commerically economical mode of operation. However, since it was shown that the mill could be operated by other than electrical power, "Selection of an electric motor did not make the grinding mill an essentially electrical article."

The various exhibits in the instant case, together with the evidence describing the nature, function, and operation of the window punching and patching machine in issue, satisfy us that the device is a machine within the purview of paragraph 372 of the Tariff Act of 1930, as modified, *supra*. *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T.D. 37537, *United States* v. *J. E. Bernard & Co., Inc.*, 30 C.C.P.A. (Customs) 213, C.A.D. 235, and *United States* v. *Baker Perkins, Inc., R. F. Downing Co., Inc.*, *supra*.

Based upon the record and the authorities cited, we find and hold that the device in controversy is not an article having as an essential feature an electrical element or device, within the meaning of paragraph 353, as modified, *supra*, but is a machine, within the meaning of paragraph 372, as modified, and dutiable at the rate of 12 per centum ad valorem, as claimed by plaintiff. That claim in the protest is sustained, and judgment will issue directing the collector of customs to reliquidate the entry accordingly.