(C.D. 2596)

GANE BROS. & CO. OF N.Y., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided December 6, 1965)

*Allerton deC. Tompkins* for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Richard J. Kaplan* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before RAO and FORD, Judges

FORD, Judge: The imported merchandise under protest herein is invoiced as "1 Original Will Index Card Unit." It was classified under paragraph 353 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, as an article having as an essential feature an electrical element or device, with duty at 13¾ per centum ad valorem.

The plaintiff claims classification under paragraph 372 of the said tariff act, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, at 10½ per centum ad valorem, as printing machinery.

The plaintiff claims, alternatively, that the article does not have an electrical element as an essential feature and should be classified under paragraph 372, as modified by T.D. 54108, *supra*, under the provisions for other machines, not specially provided for, at 11½ per centum ad valorem; that, in this latter event, the motors imported with the article should be classified separately with duty at 10½ per centum ad valorem under paragraph 353, as modified by T.D. 54108, *supra*, under the provision for electric motors of more than 1/10 but less than 200 horsepower. It was agreed that, if the court does not hold the imported article to have as an essential feature an electrical element or device, the machine is in chief value of metal, and that it conforms to the meaning of the term "machine" under tariff law.

The pertinent portions of the statutes involved herein are as follows:

### THE STATUTES

Classified under:

Paragraph 353 of the Tariff Act of 1930, as modified by T.D. 52739:

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

 * * * * * * *

Other * * *_____ 13¾% ad val.

Claimed under:

Paragraph 372 of the Tariff Act of 1930, as modified by T.D. 54108:

Printing machinery (except printing presses and except printing machinery for textiles):

 * * * * * * *

Other_____ 10½% ad val.

 * * * * * * *

Machines, finished or unfinished, not specially provided for:

 \* \* \* \* \* \* \*

Other \* \* \*_____ 11½% ad val.

Parts, not specially provided for, wholly or in chief value of metal or porcelain, of any article provided for in any item 372 in this part_____ The rate for the article of which they are parts.

Paragraph 353 of the Tariff Act of 1930, as modified by T.D. 54108:

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

 \* \* \* \* \* \* \*

 Motors:
 Of more than $\frac{1}{10}$ horsepower but less than 200 horsepower_____ 10½% ad val.

The record herein is comprised of the testimony of one witness for the plaintiff, three exhibits for the plaintiff, and the aforementioned agreement between counsel that the merchandise herein is in chief value of metal, and that if the court should hold that said merchandise does not have essential electrical features it does meet the tariff definition of a "machine."

The issue is, first, whether the imported index card unit is printing machinery within the meaning of paragraph 372 of the tariff act, as modified, *supra;* secondly, whether the said index card unit has as an essential feature an electrical element or device; and, thirdly, whether the plaintiff has established by the record sufficient proof to sustain the burden of proof incumbent upon the party challenging the classification of the collector.

Clifford B. Webb testified for the plaintiff, the importer herein, Gane Bros. & Co. of N.Y., Inc.: That it imported and sold machinery of various kinds to printing and bookbinding establishments in the United States; that he was familiar with the imported article and that he knew its mechanism and functions. The witness identified plaintiff's exhibit 1, referred to as the manufacturer's catalog, a page on both sides picturing and describing the actual index card machine at bar. Its admission as evidence was limited to the picture, no printed matter thereon being admitted at this stage of the record. Plaintiff's exhibit 2, a schematic drawing of the machine herein was also received in evidence, but limited as evidence to the left-hand top corner thereof.

Mr. Webb stated that the index card unit is a machine which prints ruled lines in two colors or prints emblems in one color; it cuts the finished product to size and delivers the counted cards or sheets, which-

ever are used, onto a delivery system. He identified plaintiff's exhibit 3 as an example of the type of card, without emblems, produced by the machine at bar.

Referring to exhibit 1, the witness said that the machine was equipped automatically to produce a high output of card stock, such as ruled and printed index cards, record cards, playing cards, and postcards; that printing the lines and emblems was similar to other forms of printing where ink is applied to paper. The raw material used, he stated, is a roll of paper. He marked exhibit 1 to show said roll, and the printer. Printing is done by a printing inkwell which has metal disks supplied with ink, then slightly cleaned to prevent too much ink from accumulating, after which the ink is transposed by the rollers onto the paper. The emblems and lines are printed onto the paper exactly the same way, from disks, the lines from ruling disks. He said that this type of machine can produce two different colors; that he has never known such an apparatus to be used as a printing press, or used for printing on textile; that he knew there are other well-known types of printing machines that perform more than just a printing operation, such as the rotary press and the lithography machines, both of which, after the printing operation, cut the paper, or card, or board to size and stack the finished product. There are other printing machines which, in addition to printing, have what is called a diecutting attachment to make a box out of the resulting printing; the Champlain is probably the best example of that press, but not all machines diecut, and all of the machines to which he referred do more than just print.

Referring to the schematic drawing (exhibit 2), the witness identified the printing attachment, called the longitudinal inking attachment; also, two cutters, No. 4, the longitudinal cutter, and No. 5, the cross-cutter; and No. 7, the stacking device. The witness stated that the machine as imported had certain electrical features which he identified and marked on exhibit 1 as a motor control box and a solenoid switch. The control box is for stopping and starting the motor or to make it run fast or slow. Power from the motor is transmitted to the machine by belt drive, the motor itself having a floor mounting. The witness stated that power other than electricity could be used alternatively on this or on any belt-driven machine, such as an internal combustion or a steam engine, or any other power that might be hooked to the machine by the same belt or another kind of belt.

Asked what would have to be done to use power other than electricity to operate the machine before the court, the witness stated that he would obtain an alternative power unit and hook it to the belt drive on the machine. He thought it would be commercially practicable to do this, where electricity was not available. He stated, however, that

he had never seen these machines operated other than by electric power. He stated that an electric motor of 1.5 to 2¾ horsepower, which is a standard motor, was imported with the apparatus before the court; the motor could be used also separately for other purposes.

The solenoid switch stops and starts the collating drum on the machine as it accumulates and counts the cards; for example, if 100 cards are collected at a time, the solenoid switch will move the drum so that another 100 may be collected. The witness stated that it was not "one hundred percent necessary to use electrical current," for, if necessary, air pressure could be used, requiring an air compressor to operate the switch. On exhibit 2, the part that is pertinent to the printing function of the machine, is the longitudinal inking attachment, which prints straight lines.

On cross-examination, the witness read the following excerpt of the description of the machine as given on the invoice:

> 2 feint line disc inkers for single sided ruling only, but provision being made in the ruling head frame to enable to install at a later date 2 further feint line inkers to produce double sided rulings in 2 colors each side of the web.

He stated that these feint line rulers would print a straight line, and the two additional ones would print straight lines on the other side of the card, when desired.

The witness marked exhibit 1, showing the electric motor, the control box, and the solenoid switch previously identified by him. He also marked the switch which controls the switch box as "Switches for control box," which are electrical switches; the pipe running from below the switches to the switches as "Pipe to control box"; a certain part of the machine containing electric wires as "Electric wire"; a second electric motor as "Motor," which is used just to pull the conveyor belt along; a little white box as an "Emergency Stop Switch"; and a small white tube coming out of that box as "Electric wire." The function of the emergency stop switch, which is an electric switch, is to start and stop the belt motor which starts and stops the moving of the belt. He also marked certain piping as "Electric wiring." The panel for the "Switches for control box" contains six buttons, each having a different function, and each activating the motor by electric power. All of these items identified on exhibit 1 were imported with the machine; they are not a part of the machine, but are "extraneously" attached to the machine, according to Mr. Webb.

Continuing, on cross-examination, Mr. Webb testified that the solenoid switch works by electricity; that it takes an electrical impulse to trigger this device; and that a solenoid switch could not be operated by air pressure, as it would be necessary to have an air switch.

Mr. Webb testified that he had never seen a motor identical to the large motor on exhibit 1 used separately from the machine. He has

never seen this machine operated by a power source other than electricity. The electric elements on the machine, identified by him on exhibit 1 as wiring, electric motor switch box control, control box, pipe to control box, and other items, obtain their electric power from the mains in the building in which the machine is installed, to the control box. The machine described on the invoice and illustrated in exhibit 2 can print longitudinal lines; it cannot print other than longitudinal lines without further modification.

Mr. Webb testified that the part of exhibit 1 marked as a motor, which is used in moving the conveyor belt, can be replaced by a source other than electricity as the source of power; that the later models do not have a motor on them, just a shaft drive from the main machine; that other sources of power different from this motor can be readily substituted to drive the conveyor belt; and that, if electricity was not available, another source of power could be used to drive this apparatus efficiently. The switches for the control box on exhibit 1 have control only over the motor, and if a source of power other than electricity is used, these switches would not be useful.

The witness concluded his testimony by stating that he does not have an engineering degree, or an engineering background, is not a designer, has never designed any machinery, and never personally operated the imported machine.

Our first inquiry is to determine whether the imported apparatus is printing machinery, within the meaning of paragraph 372 of the tariff act, as modified, *supra*.

The machine before us can perform, it is testified, a multiple number of functions. It can print horizontal lines, cut cards to desired size from a roll of paper, stack them, count them, and, with the automatic solenoid switch, pass them on in whatever quantities desired. The function of the machine is more than just to print. Printing is only one of four of its functions.

In *Wiedemann Machine Co.* v. *United States*, 70 Treas. Dec. 550, T.D. 48605, the court considered machines with multiple functions. This case leads us into the same authority cited by both counsel as support for their respective positions, namely *Bluefries New York, Inc., and Amsterdam Continental Types & Graphic Equipment, Inc.* v. *United States*, 38 Cust. Ct. 461, Abstract 60627. Set forth in the latter case are definitions of "print" and "printing," as defined in Webster's New International Dictionary, second edition, unabridged (1955), at page 1967, as follows:

print, *n.* 1. A mark made by impression; a line, character, figure, or indentation, made by the pressure of one thing on another.

print, *v. Transitive:* 1. To fix or impress, as a stamp, mark, character, idea, etc., into or upon something or someone.

print, *v.* * * * 6. To stamp or impress with characters, figures, patterns, or the like, transferred by pressure from plates, types, or the like; as, to *print* cards also, to transfer an impression of;—often with *on;* as, to *print* a design on calico.

printing, *n.* 1. Act, art, or practice of impressing letters, characters, or figures on paper, cloth, or other material.

Quoting from the same case:

The evidence establishes beyond doubt that the subject machine makes marks by impression upon paper. The machine produces lines, characters, figures, or indentations by the pressure of one thing on another. It stamps or impresses with characters, figures, patterns, or the like, transferred by pressure from plates, types, or the like. The work of the involved machine is also the act, art, or practice of impressing letters, characters, or figures on paper. This would appear to completely answer all the requirements of "print" and "printing," quoted above. A machine that prints, and performs no other operation, could not be other than a printing machine.

Our attention is particularly drawn to the words "and performs no other operation" in the last sentence. According to the authorities cited, *supra*, the primary function for which the machine was constructed, *inter alia*, requires consideration.

In point is the case of *H. W. Brintnall Co.* v. *United States*, 4 Cust. Ct. 73, C.D. 289, wherein the merchandise was a paper bag making machine with a printing roller attached which permitted bags to be made and printed in one operation, if bags with printing thereon were desired. The merchandise was classified as a machine, not specially provided for, under paragraph 372, Tariff Act of 1930, but was claimed dutiable as printing machinery under the same paragraph. The court upheld the classification as a machine, not specially provided for, rather than as printing machinery, saying (page 74):

While it is undoubtedly true, as stated in said brief, that the Congress in the Tariff Act of 1930 provided for printing machinery instead of printing machines, nevertheless, in spite of this broadening of this tariff provision a machine to come within the new provision must be a printing machine or printing machinery. The provision does not admit machines which do other than printing. It is manifest that the machine at bar is more than printing machinery, and the printing is merely incidental to its main function. It is primarily a paper bag making machine which, only when it is desired, can print something on the bags.

In the case of *Kraut* v. *United States*, 130 Fed. 392, T.D. 25178, 7 Treas. Dec. 568, the United States Circuit Court for the Southern District of New York had before it the question of the tariff classification of certain printed paper bags. In affirming the decision of this court (then the Board of General Appraisers) the appellate court held that paper bags with incidental printing thereon were still paper bags and not printed matter within the meaning of paragarph 403 of the Tariff Act of 1897, and as such were properly dutiable under paragraph 407 of said act as manufactures of paper not specially provided for. So far as we know that decision has been consistently adhered to.

In the case at bar, after analyzing the *Brintnall* case, *supra*, it is quite apparent that printing on the index card is merely one function of the machine before us. The court has not been enlightened as to which function is deemed the primary function. We note, however, that the title of exhibit 2, as indicated by the witness on redirect examination, is "Original Will Fully Automatic Index Card Making Machine." The words, "card making machine," we also deem significant as best describing the primary purpose of its construction. Based upon the record before it, the court may not conclude that any one function is more important than any other. In view of this, we are of the opinion that plaintiff has failed to establish the imported merchandise to be printing machinery.

The foregoing conclusion brings forward the next pertinent inquiry concerning the plaintiff's alternative claim, that the imported machine does not have an electrical element as an essential feature and, therefore, should be classified as "other machines, not specially provided for," under paragraph 372, as modified by T.D. 54108, *supra*.

At this point, it might appear that, since it is not classifiable as printing machinery, it is, nevertheless, a machine in chief value of metal since it was stipulated between the parties as conforming to the definition of machine, as stated, *supra*. Standing in the way of this likely assumption is the collector's classification of the machine under paragraph 353, with its attendant presumption of correctness, entailing a certain statutory burden of proof upon the plaintiff, *F. H. Kaysing* v. *United States*, 49 CCPA 69, C.A.D. 798. This burden is dual in that plaintiff must establish the invalidity of the collector's classification, and the proper classification which he claims. *Davies, Turner & Co.* v. *United States*, 40 CCPA 193, C.A.D. 517.

On the subject of the essential electrical feature of a machine we note, *inter alia*, *Keer, Maurer Company* v. *United States*, 48 Cust. Ct. 205, C.D. 2336, in which is considered the much-cited case of *United States* v. *Dryden Rubber Co.*, 22 CCPA 51, T.D. 47050, that the crux of establishing such essentiality is whether the machine can function normally for the purposes intended without such an electrical feature. If not, it is deemed that the electrical feature is essential, and classification is within the scope of paragraph 353, *supra*. However, it has been held that, in situations where a machine may be motivated by power, other than electric, interchangeably, selection of an electric motor did not make it an essentially electrical article. See also *United States* v. *J. E. Bernard & Co., Inc.*, 30 CCPA 213, C.A.D. 235; and *Frank P. Dow Co., Inc., and Evergreen Distributors, Inc.* v. *United States*, 52 Cust. Ct. 235, Abstract 68234, wherein we stated:

Where such an article can utilize electrical power or other power interchangeably, the question of whether any modification of the machine *pe se* is

necessary to accomplish this must be considered. In the event that substantial modification or reconstruction is necessary, said machine, if electrically operated, would remain within the purview of paragraph 353, as modified.

This brings us to a vital factor in the case at bar, to determine whether it would require substantial or minor modification or reconstruction of this machine *per se* to convert it from one electrically powered to one motivated by power other than electricity.

The plaintiff has the burden of proof to establish by sufficient evidentiary facts of record that the aforesaid conversion would not require substantial modification or reconstruction.

In the instant case, the record does not, in our opinion, contain the proof necessary to satisfactorily establish the removal of the involved merchandise from within the purview of paragraph 353, *supra*, and bring it within the scope of paragraph 372, *supra*. The witness was not an engineer, designer, or a technical man on the subject of either electricity or machines. His testimony did not and could not go into whether substantial modification or reconstruction was necessary in the substitution of electrical power with some other source of power. Therefore, plaintiff has failed to overcome the presumption of correctness attaching to the classification of the collector.

Based upon the record herein, and upon the principles enunciated in the case of *Frank P. Dow & Co., Inc.*, *supra*, together with the other cases cited and pertinent hereto, it is the opinion of this court that the plaintiff has not offered proof sufficient to sustain its burden on the issue of substantial modification.

Therefore, the protest of the plaintiff is overruled, and the classification of the collector is affirmed.

Judgment will be rendered accordingly.